56 CCPA

### Application of John Hampton MOORE.
### Patent Appeal No. 8061.

United States Court of Customs and Patent Appeals.

April 17, 1969.

Richard C. Witte, Robert B. Aylor, Stephen R. Smith, Thomas H. O'Flaherty, Cincinnati, Ohio, Francis Cole, Watson, Cole, Grindle & Watson, Washington, D. C., attorneys of record, for appellant.

Joseph Schimmel, Washington, D. C., for the Commissioner of Patents. Jack E. Armore, Washington, D. C., of counsel.

Before WORLEY, Chief Judge, KIRKPATRICK, Judge, sitting by designation, RICH, ALMOND and BALDWIN, Judges.

WORLEY, Chief Judge.

The issue here is whether the Board of Appeals committed reversible error in affirming the examiner's rejection of claims 3–10 [1] in view of certain prior art under 35 U.S.C. § 103.

---

[1]. Appearing in application serial No. 269,785, filed April 1, 1963 and entitled "Bleaching Packet."

The invention relates to a pre-measured, dry bleach packet for use in home laundry. By way of background, the specification states:

It is *well known* that pre-weighed amounts of detergent products and bleach products can be packaged in water soluble films as, for example, polyvinyl alcohol to provide convenience in handling and measuring and freedom from dust. However, *when chlorine bleach compounds are packaged in polyvinyl alcohol film, the reactivity of said chlorine compounds and other materials associated with said chlorine compounds is such that the polyvinyl alcohol film tends to be made insoluble in water.* Since the utility of this form of packaging depends upon the water solubility or dispersibility of the polyvinyl alcohol film, such insolubilization makes it difficult to prepare acceptable chlorine bleach packets. [Emphasis supplied.]

To obviate those problems associated with polyvinyl alcohol (PVA) envelopes containing a chlorine bleach, appellant has devised a product consisting of (1) an outer envelope of water-soluble PVA containing a relatively small percentage of unhydrolyzed polyvinyl acetate and plasticized with various "external" plasticizers, and enclosed therein (2) a dry, water-soluble bleach product consisting essentially of a particular chlorine bleach —potassium dichlorocyanurate [2] (hereafter KDCC)—and such optional ingredients as alkaline salts, inert bulking salts and synthetic detergents, as reflected in claim 3:

3. A bleaching packet consisting essentially of (a) an envelope of polyvinyl alcohol film containing from about 5% to about 40% unhydrolyzed vinyl acetate, said film being plasticized with a plasticizer selected from the group consisting of glycerine, ethylene glycol, polypropylene oxides having a molecular weight of from about 150 to about 400, polyethylene oxides having a molecular weight of from about 100 to about 300, copolymers of propylene oxide and ethylene oxide having a molecular weight of from about 100 to 400, alkyl phenol ethylene oxide condensates having a molecular weight of from about 200 to about 1000 wherein the alkyl group has from about 1 to about 18 carbon atoms, phenol ethylene oxide condensates having a molecular weight of from about 200 to about 400, and mixtures thereof, (b) and enclosed therein a dry water-soluble bleach product consisting essentially of from about 5% to about 30% potassium dichlorocyanurate material having a pH ranging from about 5.8 to 6.4, the balance being 0% to 98% alkaline material selected from the group consisting of trisodium phosphate, tripotassium phosphate, sodium tripolyphosphate, sodium carbonate, potassium carbonate, sodium silicate, potassium silicate, and tetrasodium pyrophosphate, 0% to 98% inert material selected from the group consisting of sodium sulfate, sodium chloride, and potassium chloride, and 0% to 30% bleach compatible synthetic detergent surfactant selected from the group consisting of soap and anionic non-soap, and nonionic organic synthetic detergents, the pH of said composition being from about 9 to about 11, and the total moisture content of said composition being less than about 15% and the free moisture content being less than about 1%.

It appears from the specification that appellant has taken various measures to stabilize his bleach product in order to minimize reaction between bleach product components (including KDCC, its degradation products, and the other additives) and water-soluble PVA. Thus,

---

2. According to the specification, KDCC liberates hypochlorite ion, C10—, to provide bleaching activity on dissolution in water.

appellant uses at the outset a relatively pure KDCC material having a pH from about 5.8 to about 6.4,[3] postulating that KDCC of lower purity and pH contains (1) certain inorganic acids, such as hypochlorous acid (HOCl), which cause the formation of insolubilizing ether cross-links between adjacent molecules of polyvinyl alcohol during storage of the bleach packet, and (2) certain other acidic impurities, such as trichlorocyanuric acid or dichlorocyanuric acid, "which are detrimental to product stability." Appellant further employs a bleach composition which has a total moisture content, including water of hydration, of less than 15% and a free moisture content of less than 1%, having found that water reacts with KDCC or its impurities to produce the deleterious, PVA-insolubilizing, inorganic acids. Advantageously, the individual particles of KDCC may be "protectively" coated [4] with a material which appears to form a barrier to moisture penetration. Finally, appellant states, acidic degradation products of KDCC, once formed, can be neutralized and prevented from reacting with the PVA film enclosure by including in the bleach composition sufficient alkaline material to give a total product pH of "preferably" about 9 to 11.

According to the specification, the final bleach product may be in granular form or "in the form of compressed tablets." In the latter case, it is said the PVA film "helps to maintain the tablet form of the bleach product."

The references are:

| | | |
|---|---|---|
| Abbott | 2,635,400 | April 21, 1953 |
| Morgenthaler | 3,112,274 | Nov. 26, 1963 |
| Lee | 3,120,378 | Feb. 4, 1964 |
| Fuchs (Australia) | 219,930 | Jan. 22, 1959 |
| Miller (Canada) | 510,555 | Mar. 7, 1955 |
| Marks (German) | 1,053,739 | Mar. 26, 1959 |

"Elvanol," Publ. of E. I. DuPont & Co. (1947), pages 4, 17, 18, 19, and 31.

---

Fuchs observed that various chlorine-containing bleaches, including trichlorocyanuric acid, had not been satisfactory for commercial use because of "lack of adequate stability during formulation into commercial preparations and during storage." In contrast, he found dichlorocyanuric acid "to have excellent stability" during manufacture and storage. The alkali metal salts of dichlorocyanuric acid may also be used, being more soluble than the acid itself and forming "solutions that are approximately neutral." For practical use, the bleach material may further be combined with various alkaline compounds, synthetic detergents and inorganic fillers. In that regard, Fuchs states:

The presence of alkaline compounds aids in the release of chlorine from dichlorocyanuric acid and therefore renders the latter compound more effective for bleaching and other applications in which an alkaline solution of a hypochlorite is needed. A very high alkalinity, such as indicated by a pH of 12 or higher, is in general undesirable and hence when free hydroxides, such as sodium hydroxide, are used, the amount must be carefully controlled.

3. Measured at a concentration of 1% in aqueous solution at room temperature.

4. According to appellant's specification, a process for so coating KDCC is set forth "in the copending application of Morgenthaler and Parks, Serial No. 855,139, filed November 24, 1959 now U.S. Patent 3,112,274." As will be seen, that patent was employed by the examiner in his rejection of the claims.

Morgenthaler discloses a *stable*, dry bleach composition comprising granules of a polychlorocyanurate (e. g., tri-and dichlorocyanuric acid and alkali metal salts of dichlorocyanuric acid) spray-coated with an inorganic salt, preferably alkaline,[5] to protect the polychlorocyanurate from attack by material with which it is reactive, such as moisture and air "which are known to increase the tendency of such compounds to decompose." Preferred polychlorocyanurates are the sodium and *potassium* dichlorocyanurates "since they are more stable than the polychlorocyanuric acids." Sodium tripolyphosphate alone or in admixture with sodium sulfate (an inert salt) is the preferred alkali which provides "the desired buffered alkalinity for the optimum bleaching activity of the polychlorocyanurate." The alkaline coating may also contain 0–10% suitable synthetic anionic detergents. The weight ratio of coating material to polychlorocyanurate ranges from 1:3 to 5:1. The coating material (a slurry) should have a pH less than 11 since "a pH higher than about 11 undesirably decreases the stability of the polychlorocyanurate particles on which it is sprayed." Total moisture content is in the range of 2–15%. The free moisture content of the final product is a carefully controlled variable, Morgenthaler stating:

> * * * The finished product should not contain more than about 2% free moisture, preferably not more than about 1%, since more than this amount decreases the stability of the product * * *

Finally, Morgenthaler observes:

> *The coated polychlorocyanurate particles obtained in the process of this invention are more stable and have less chlorine odor than either uncoated polychlorocyanurate particles or granular products having the same composition but dried by different processes.* Other drying processes do not provide the protective coating that is obtained in the process of the present invention. *This coating comprises a substantially complete film of inorganic salt around the polychlorocyanurate particles.* [Emphasis supplied.]

Lee discloses a water-soluble bleach *tablet* possessing "excellent stability during storage" containing (1) dichlorocyanuric acid or its alkali metal salts, particularly the sodium salt or potassium salt (the latter being KDCC), (2) an alkali metal carbonate, (3) a hydrate forming compound and (4) a solid acid. The acid and carbonate react upon dissolution in water to form effervescent carbon dioxide which facilitates solution in water. The preferred tablet contains "no free water," thus preventing the premature release of available chlorine. Lee prefers the dichlorocyanurates "rather than the well known trichlorocyanurates because of the greater stability" of the dichloro compound. According to Lee:

> * * * The tablet can also be coated with a water soluble film, *such as a polyvinyl alcohol film,* if desired. [Emphasis supplied.]

All claims were rejected under § 103 as unpatentable over Fuchs or Morgenthaler in view of Elvanol, Abbott, Lee, Miller and Marks.[6] The examiner and board were of the view that Fuchs and Morgenthaler each establish that appellant's bleach product is "substantially old," and that placing that product with-

---

5. According to Morgenthaler, alkaline salts had previously been used in bleaching compositions containing polychlorocyanurates since "polychlorocyanurates provide the greatest bleaching activity in water under alkaline conditions."

6. With the possible exception of Lee, the secondary references disclose no more than what appellant concedes to be "well known" in the first place—namely, that various laundry products such as detergents and bluing have long been packaged in water-soluble PVA films having the same, or similar, formulations as appellant's films. With that in mind, it is unnecessary to discuss Elvanol, Abbott, Miller or Marks further. Certainly, none of the latter references contain any discussion of KDCC bleach or of any problem that might be encountered in placing KDCC in a film of PVA.

in a water-soluble PVA film would be "clearly obvious" in view of the secondary references. No patentable significance was attached to the claim limitations relating to moisture content and the pH of either KDCC or the total product.

Here, appellant urges that the prior art does not adequately suggest either the combination of KDCC-containing bleach and PVA film or the conditions required to produce a stable, water-soluble product. Throughout his brief, appellant asserts that the art was aware that all chlorine bleaches were incompatible with PVA film, yet had suggested no solution to that problem. He contends the board erred in ignoring the problem associated with packaging chlorine bleaches in water-soluble films and in failing to accord significance to the particular moisture and pH conditions recited in the claims. He points to certain data in his specification which assertedly establishes that the operational pH and moisture content ranges in the claims are necessary and critical to obtention of a bleach product having a PVA film covering which is not insolubilized in storage.

 As the solicitor points out, there is little of record to substantiate appellant's claim of what the art knew concerning the asserted incompatibility between chlorine bleaches and PVA film, other than the paragraph of the specification we have heretofore reproduced.[7] That factor may in part account for the unfortunate circumstance that the examiner and board did not discuss or controvert the existence of the unsolved problem which appellant says the art faced with respect to packaging chlorine bleaches in PVA films, even though it was argued below. Cf. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545. But granted the problem of stabilizing an active chlorine-containing bleach composition did exist,

it seems to have been quite universal, whether the ultimate product was to be packaged in foil-wrapped cardboard cartons, as suggested by Morgenthaler, or in water-soluble PVA envelopes as appellant intends here. While one of ordinary skill in the art might know that chlorine bleach materials *other* than a bleach containing KDCC were incompatible with PVA because of their reactivity and instability, no clear reason appears from the record why it would be thought KD CC would necessarily fall in the same category when stabilized and segregated in the manner taught by Morgenthaler. It seems to us that Morgenthaler's discovery—that the spray coating of KDCC (which is desirably free of unstable tri- or diclorocyanuric acids and instability-causing moisture) with an alkaline moisture barrier solved certain stabilization problems in his contemplated environment—would suggest to one of ordinary skill that a similar problem might be solved if Morgenthaler's stabilized composition were to be used as the bleach component of a water-soluble bleach packet employing PVA as the packaging material. We see no reason why one of ordinary skill would necessarily be surprised that KDCC, when relieved of its free moisture and less stable impurities and when "protectively" coated with alkali—indeed, effectively isolated from materials with which it might be reactive—in the manner taught by Morgenthaler, could be placed in a PVA envelope without the degree of danger of insolubilizing the film that previously existed.

With respect to the particular claim limitations relating to moisture content and pH that appellant relies on here, it appears that the prior art and appellant have proceeded in much the same manner to achieve the object of a stabilized product. Morgenthaler (and Lee, for that matter) desires a product of low free moisture content for the same reason as

---

7. Appellant cites a patent to Friedman, No. 3,322,674 as further evidence the problem was known. That patent was not considered by the board, does not form part of the "evidence produced be-

fore the Patent Office" in this appeal, and is not considered here. In re Cofer, 53 CCPA 830, 354 F.2d 664, 148 USPQ 268 (1966).

appellant—namely, to avoid premature release of available chlorine in the bleach in the form of acidic degradation products. Further, both appellant and the prior art recognize that the alkali metal salts of dichlorocyanuric acid offer the best stability of the various active-chlorine containing cyanurate bleaches, and that the presence of those other cyanurates, e. g., tri- or dichlorocyanuric acid, is not compatible with product stability. It seems clear that the prior art prefers to use a relatively pure KDCC—sans the tri- and dichlorocyanuric acids which arise as impurities in the course of manufacture of KDCC—for optimum stability, and that is about all that the claim recitation of a KDCC material pH range of 5.8–6.4 [8] reflects.

Insofar as the pH value of the entire bleach composition is concerned, it is evident that Morgenthaler and Fuchs much prefer a composition having a pH in solution of between 7 and 11 or 12. The fact that those references do not precisely disclose the bleach product pH limitations of 9–11 recited in appellant's claim is, we think, not of controlling significance here. Apart from the fact that appellant is operating within the alkaline range broadly suggested by them, there is no evidence in the record that operation within the claim limits is necessary or critical when employing Morgenthaler's *alkali-coated* KDCC particles, rather than *gross mechanical mixtures* of KDCC and alkali particles, in the claimed combination as appellant concededly intends to do.

Our review of the record with due regard for appellant's arguments convinces us the board did not err in sustaining the rejection. The decision is affirmed.

Affirmed.

KIRKPATRICK, J., took no part in the decision of this case.

RICH, Judge (dissenting).

I fail to see the obviousness of appellant's evident contribution to the art of *successful* packaging of potasium dichlorocyanurate (KDCC) bleach compositions in polyvinyl alcohol (PVA) film containers in such manner *as to preserve the water solubility* characteristic of the film *during storage.* The majority has not pointed to anything in the prior art which either recognizes the problem or suggests how to solve it. The solution of the "unsolved problem." appears to have been totally ignored throughout this prosecution. It *now* appears obvious only by hindsight reasoning, much of it originating since this case left the Patent Office, where there is some familiarity with the art. The majority even adverts to "the unfortunate circumstance that the examiner and board did not discuss or controvert the existence of the unsolved problem * * *." It is indeed unfortunate, but that is no reason for penalizing the applicant, whose application is primarily directed to a discussion of it and how one solves it.

It is clear to me that appellant has found out (discovered) a considerable amount of useful technology on the practical packaging of KDCC bleach compositions in PVA films which is not to be found by reading the references.

It must be conceded there are limitations in the claims on appeal, alleged by appellant to be of importance to his practical solution of the problem but minimized if not extinguished by everyone else, which *do* distinguish from the prior art unless we apply to that art an undue amount of imagination and surmise. For example, the majority opinion speculates about the presumed art's desire to use "relatively pure KDCC" which *would* (if such desire exists and is followed) result in using KDCC within the claimed pH range of 5.8–6.4. Appellant's specification shows that to be a factor of consid-

8. Inasmuch as Fuchs states that the alkali metal salts of dichlorocyanuric acid are "approximately neutral," e. g. pH=7, in solution, it would appear that some quantity of acidic impurity still remains in appellant's KDCC material having a pH of 5.8–6.4 in solution.

erable importance, unknown to the art, in preventing the insolubilizing of the PVA container. The examiner and the board neglected entirely to discuss this specific limitation. Indeed, their arguments in support of the rejection are primarily on the following rather broad basis: (1) packaging "detergent and similar compositions" in PVA is old; (2) appellant's bleach compositions are *"substantially"* old; and (3) it would therefore be obvious to package appellant's compositions in PVA. It might. But if that is *all* that is done, it has been found that the PVA envelopes grow increasing insoluble during storage and do not dissolve in water, as desired when used in the laundry. What appellant is claiming is not merely what the board found to be obvious. His invention is not a broad one. It is a narrow solution to a narrow problem, he has claimed it specifically, he has taught the art the solution, and I think he is giving a sufficient quid pro quo in his advancement of the art to justify giving him his limited claims, with the result that his solution is made known to the world through the issuance of a patent.

The record shows it is not obvious how to *successfully* package KDCC bleach compositions in PVA. The broad concept the Patent Office deems to have been obvious to those skilled in the art appears to have been considered by the latter not only to be unobvious but to have been impracticable. This looks to me like another instance where the obviousness of an invention is clear only to the relatively unskilled people who have no connection with the art.

I particularly object to the evolution in the majority opinion of entirely new theories of application of the prior art to the obviousness issue, such as the arguments predicated on the supposed effects of Morgenthaler's alkali coating on the KDCC. I do not find that the Patent Office ever applied such a theory. While it is not for me to provide the technical answer to it—that being the supposed right of the appellant with respect to new theories of rejection[1]— I nevertheless note the following: The majority reasoning is that Morgenthaler's alkali coating *should* suggest to those skilled in the art a solution to the problem of insolubilizing of PVA envelopes during storage, wherefore it is obvious to use Morgenthaler's composition in that environment. But appellant's specification discloses, inter alia (my emphasis):

> The *alkaline* material in the bleach product tends *in the presence of moisture,* to hydrolyze an additional percentage of unhydrolyzed vinyl acetate in the film, thereby changing the water solubility characteristics of said film.[2]

I also note from the "Elvanol" reference ("Elvanol" being DuPont's trade name for various polyvinyl alcohols differing in degree of polymerization and degree of hydrolysis, or saponification) that "the most widely used 'Elvanol' plasticizer is glycerin," a notoriously hygroscopic material.[3] The record shows

---

1. See 35 U.S.C. § 132. The province of this court is to review the rejections as made in the Patent Office where applicants are provided a reasonable opportunity to traverse them and where there is supposed to be technical competence to weigh their answers.

2. Numerous "alkaline material" components in the "bleach product" are disclosed including those used by Morgenthaler for coating. The specification explains, with respect to this so-called water-soluble so-called PVA (which is not a single specific substance), that PVA is made by hydrolyzing polyvinyl acetate

and that maximum water-solubility is obtained when it is approximately 88% hydrolyzed. Appellant prefers to start by using for packages a material which is about 80% hydrolyzed, the lower end of the 80–90% range he considers desirable, so that some further hydrolysis during storage will not adversely affect solubility.

3. See the definitions of "glycerol," which is glycerin, in Webster's New International Dictionary and Van Nostrand's Scientific Encyclopedia, the latter stating expressly that it "absorbs water on exposure to the atmosphere."

that it is necessary to use plasticizer in PVA to make it flexible. Glycerin is one of the plasticizers disclosed by appellant. Now an envelope of water-soluble PVA plasticized with a hygroscopic plasticizer would scarcely be calculated to keep moisture out of its contents and I suggest, merely as a counter-theory to the majority's theorizing about the prior art, and quite as tenable I think, that Morgenthaler's *alkaline* coating would be thought likely, by those skilled in the art, to hydrolyze and insolubilize the PVA and render its use impracticable. This is because moisture would be expected to get to the alkaline coating on Morgenthaler's coated KDCC particles through the PVA envelope containing water-absorbing plasticizer, and the moist alkaline material, independently of the KDCC, thereupon would cause further hydrolysis and reduction in the solubility of the PVA. I may be wrong. So may the majority.

In any event, I consider it beyond the province of this court to devise *new* theories as to how combinations of chemical compounds and mixtures disclosed by the references may interact or react under various conditions of storage over different periods of time. Such matters can be determined only by actual tests. Appellant has made tests. We have not, nor has the Patent Office. Neither do any of the references show any investigation of the problem of preventing the insolubilization of PVA enclosures by the materials contained in them! I think the rejections—both those made by the Patent Office and those independently conceived by the majority—are too speculative to support a finding of obviousness under section 103 and I would reverse.